**UNITED STATES**

v.

**Roberto S. CENTENO, 568 08 5784, Airman (E–3), U.S. Naval Reserve.**

**NMCM 83 2931.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 20 Jan. 1983.

Decided 25 Nov. 1983.

LCDR Jeanne Carroll, JAGC, USN, Appellate Defense Counsel.

LT Mark A. Zuboff, JAGC, USNR, Appellate Defense Counsel.

CAPT David B. Stratton, USMCR, Appellate Government Counsel.

Before GLADIS, Senior Judge, and BYRNE and BARR, JJ.

BARR, Judge:

Appellant, upon his pleas of guilty, was convicted by special court-martial tried by military judge alone on 20 January 1983, of an unauthorized absence from USS OKINAWA extending from 31 July 1978 to 29 November 1982, in violation of Article 86, 10 U.S.C.A. § 886, Uniform Code of Military Justice (UCMJ). The only record evidence which describes official action taken subsequent to the commencement of the absence and up to the referral stage is the

644

Charge Sheet (DD Form 458). Page 1 of that document reveals that on 9 July 1980, Naval Military Personnel Command, Washington, D.C. (NMPC), acting in the capacity as "organization" of the appellant, drafted the charge sheet. The statement of the offense on page 2 listed NMPC as the command of the appellant, though alleging the absence to be from USS OKINAWA. On page 3, the Head, Deserter Branch, NMPC, LCDR Francisco, USN, administered the oath to the accuser, thus perfecting the preferral of a sworn charge, and thereafter received the sworn charge for the Commander, NMPC, the command of the latter being held out to be that of the officer exercising summary court-martial jurisdiction in the case. Both actions by LCDR Francisco were taken on 9 July 1980. The charge was later referred, on 7 January 1983, to a court convened by Head, Military Personnel Department, Naval Station, San Diego.

On its face, the charge sheet, which evidences receipt of sworn charges within two years from the commencement of the absence by a command exercising summary court-martial jurisdiction, reveals full compliance with the statute of limitations provided for in Article 43(c), UCMJ, 10 U.S. C.A. § 843. No evidence at trial was presented which might even arguably draw the operation of the statute into question.

Notwithstanding this *prima facie* evidence of proper tolling of the statute of limitations, appellant assigns the following error for our resolution:

THE STATUTE OF LIMITATIONS WAS NOT TOLLED SINCE THE SWORN CHARGE WAS NEVER RECEIVED BY AN OFFICER EXERCISING SUMMARY COURT–MARTIAL JURISDICTION OVER APPELLANT'S COMMAND.

At the request of appellant, we granted and heard oral argument on the specified issue. As a result of filed briefs and argument, we are able to summarize appellant's position as follows:

(1) That this Court in *United States v. Rice,* 15 M.J. 605 (N.M.C.M.R.1982)

construed Article 43(c), UCMJ, to require that the official who receipts for sworn charges as the officer exercising summary court-martial jurisdiction over the command which includes the accused be "that particular summary court-martial authority under whose command an accused was attached..."

(2) That, as a servicemember can only be "attached to" one command at a time, only one officer can exercise the authority to receive sworn charges.

(3) That Section 3430100.8.c, Bureau of Naval Personnel Manual (BUPERS-MAN), in effect at the time of commencement of the absence, establishes that only the commanding officer of USS OKINAWA, the immediate officer exercising summary court-martial jurisdiction over appellant, or (though appellant wavered on this point) a superior officer exercising that jurisdiction over the USS OKINAWA, could receive sworn charges within the meaning of Article 43(c), UCMJ;

(4) That appellant was never transferred from USS OKINAWA to NMPC so as to be classified as "attached to" the latter command;

(5) That an "administrative" assignment of a deserter to NMPC does not confer the powers, or permit their exercise, to act as an officer exercising summary court-martial jurisdiction over that deserter;

(6) That NMPC had no jurisdiction to act as the command exercising summary court-martial jurisdiction in this case;

(7) That the action of the delegate of Commander, NMPC, in purporting to receive sworn charges was *ultra vires;*

(8) That because of this *ultra vires* act, sworn charges were never properly received in this case;

(9) That, sworn charges not having been received by a *proper* official within the two year period which commenced on 31 July 1978, the statute of limitations was not tolled;

(10) That a waiver by appellant of the benefits of the statute of limitations does not lie in his case.

In support of this novel contention, and one, we might add, which amounts to a proverbial "attack on the Citadel" of the procedural rubric which has governed, at least since 1951, how sworn charges may be received in the case of a deserter from the naval service, appellant relies on: the decision of one panel of this Court in *United States v. Rice, supra,* and the cases cited therein; the legislative history of Article 43(c), UCMJ (as pronounced in *Rice*); OPNAVINST[1] 5430.47 of 28 July 1972, as modified by subsequent changes; and the specific language of Section 3430100.8.c, BUPERSMAN, in effect on 31 July 1978. We shall consider the issue addressed in this order.

In the course of the appellate litigation, both the Government and appellant have argued the applicability of various provisions of the BUPERSMAN, the NAVOPS[2] which heralded, and resulted in the changes to that Manual, and the aforementioned OPNAV instruction. We, therefore, for the purpose of resolution of this case, take judicial notice of Sections 3430100 through 3430300, BUPERSMAN, in effect during the period October 1977 through April 1982, NAVOPS 125/77, 003/78, and 172/80, and OPNAVINST 5430.47. *See* Mil.R.Evid. 201(f) and 201A(a).

A different panel of this Court recently had an opportunity to examine the holding in *Rice* in relation to a similar, but not factually identical, claim. In *United States v. Needer,* No. 83 3350 (N.M.C.M.R. 23 September 1983),[3] the Court stated:

Rice was predicated on the opinion that a Marine Corps regulation ... was drafted for the *specific purpose* of procedurally implementing Article 43, Uniform Code of Military Justice (UCMJ), and Paragraph 68c, *Manual for Courts-Martial,* 1969 (Rev.) (MCM). Any attempt to apply *Rice* to the present case must, perforce, be tested by surveying the cited BUPERSMAN section for similar *unequivocal wording* of intention of application. Upon such survey, we find neither a reference within subsection 3430100(8), or that section as a whole, to the subject of preferral of charges or their receipt in sworn form by an officer exercising summary court-martial jurisdiction, nor even a remote inference that the tolling of the Statute of Limitations was a corollary act intended to be obtained by that section.

It is in this posture, then, that we are apparently invited to consider section 3430100(8), BUPERSMAN, a regulatory provision which governs how absentees and deserters from the naval service will be administratively handled *upon their return to military jurisdiction following the termination of their absence,* and extrapolate therefrom a statement of regulatory policy published with the evidenced intent to procedurally implement Article 43, UCMJ, and Paragraph 68c, MCM. A nexus between the cited section and the error addressed is wholly wanting—appellant's assertion, without proof, to the contrary notwithstanding.... (Footnotes omitted).

Appellant, aware of the above interpretation which appeared clearly to both limit

---

1. "OPNAVINST" is an acronym for identifying an instruction promulgated by the Chief of Naval Operations.

2. "NAVOP" is an acronym for identifying a message issuing from the Chief of Naval Operations which promulgates major policy changes or information affecting the operating forces of the naval service.

3. The facts in *Needer* involved an absence from Naval Air Station, Jacksonville, Florida on 17 July 1977. On 21 September 1977, while still in an absence status, Needer was transferred from NAS Jacksonville. Sworn charges were received by Headquarters, Naval District Washington, D.C. on 18 February 1979. As will become evident when we discuss the reach of section 3430100.8.c., BUPERSMAN, that section was not even arguably applicable to the facts in *Needer.*

the holding in *Rice* and define the scope of Section 3430100.8., BUPERSMAN, contended at oral argument that the historical analysis of Article 43(c), UCMJ, undertaken by the court in *Rice* resulted in a broad conceptual holding which transcended the particular facts in that case. Further, appellant took issue with *Needer's* classification of Section 3430100.8. as a regulation having neither impact upon, nor relevance to, Article 43(c), UCMJ. While we concur with, and adopt, the reasoning in *Needer,* as quoted above, and thus, perforce, also conclude that *Rice* is factually inapposite to the present case, we feel obliged to explore in greater detail the underpinnings of the conclusions reached in *Needer.*

## I

We turn first to *Rice.* As appellant has contended that the legal holding in *Rice* is applicable to our consideration, notwithstanding the dissimilarity in facts,[4] we shall assess that decision as if it be indeed precedent for the issue assigned.

We initially review the interpretation of legislative history of Article 43(c), UCMJ, set forth in *Rice:*

As noted at the time of the Code's adoption, Article 43(c) was "considered preferable to the more indefinite provision in (Article of War) 39 that the statute is tolled 'when by reason of some manifest impediment the accused shall not have been amenable to military justice.'"

*Rice, supra,* at 606. And later,

The receipt of sworn charges *by a particular summary court-martial authority* merely provides a date certain from which the two-year period may be computed. Such an interpretation of Article 43(c) reflects the drafter's dissatisfaction with the far less precise procedure instituted under the Articles of War. (Emphasis added).

*Rice, supra,* at 608.

The obvious conclusion to be reached by a reading of the above language is that under the Articles of War there was no identifiable point in time at which the statute of limitations was to be, or could be, tolled. Furthermore, the *Rice* opinion seems to suggest that only one official—the *particular* summary court-martial authority referred to—could toll the statute by receiving the sworn charges. If the former premise be accepted as correct, we are at a loss to determine in what manner, or at what time, evidence of "manifest impediment" becomes relevant. Though the language ascribed to the drafters is correct—it is incomplete and, thus, misleading.[5]

Reference to Article of War 39 establishes that the exemption from trial provided by the statute of limitations could be assert-

---

4. Rice absented himself from his command and was thereafter administratively declared a deserter and dropped from the rolls of that command. His original command, however, received for the sworn charges *after* Rice had been dropped from the rolls. The Court in *Rice* construed Marine Corps Individual Records Administration Manual, MCO P10070.12 (IRAM) as barring the original command from receiving sworn charges in the case of a member previously dropped from their rolls. Finding further that the IRAM provision was intended to implement Article 43(c), UCMJ, and that failure to follow that regulation resulted in receipt of charges by an improper official, the Court held that the statute of limitations had not been tolled.

5. The complete text of the commentary is provided:

 Subdivision (b): Adopted from AW 39. The time when the period of limitation will stop

running is changed from the time of arraignment to the time sworn charges and specifications are received by an officer exercising summary court-martial jurisdiction over the command. This provision is considered preferable to the more indefinite provision in AW 39 that the statute is tolled when "by reason of some manifest impediment the accused shall not have been amenable to military justice."

Subdivision (c): This covers all other offenses. The period of limitation is made applicable to trials by court-martial and to punishment by a commanding officer.

Subdivision (d): The language used in the second proviso of AW 39 is changed because of its indefiniteness. The clauses "in the custody of civil authorities" and "in the hands of the enemy" are adopted from Navy proposals.

ed if the offense was committed more than two years *before arraignment* of the accused. There was the aforementioned proviso, however, to the effect that "the period of any absence of the accused from the jurisdiction of the United States and also any period during which by reason of some manifest impediment the accused shall not have been amenable to military justice, shall be excluded in computing the aforesaid periods of limitation." No action could be undertaken by military authorities to toll the statute in advance of arraignment. What resulted was the requirement that, if at arraignment it appeared *from the charges* that the statute had run, the Government carried the burden of proving "by a preponderance of evidence that the statute does not apply because of periods which, under the second proviso (quoted above) of Article 39, are to be excluded in computing" the period of limitation. In contrast, the Navy practice under the Articles for the Government of the Navy, AGN 61 and 62, was for the period of limitations to end upon "the issuing of the order for . . . trial," in other words, at the time of referral. The investigation of the charges preceded the referral.

The drafters of the Code advanced the point in the processing of an offense at which the statute was to be tolled—that being when sworn charges are received by an officer exercising summary court-martial jurisdiction over the command. The rationale for this choice was simple: Under both Army and Navy practice, the absence of a servicemember prevented the services from tolling the statute, as his presence was necessary at both arraignment and for the pre-investigation which preceded referral. By selecting the "receipt" stage, custody over an absentee was no longer necessary to toll the statute.[6] The "receipt stage" is the last formal procedural step in pretrial processing under the Code which can be accomplished without having custody over—the presence of—the accused. The drafters did not, by advancing the point in time, as a matter of procedure, for tolling the statute of limitations to the receipt stage, intend thereby to benefit an absentee. Quite to the contrary, the view was uniform that a servicemember should not be permitted, by his illegal act of absence without authority, to defeat the statute of limitations.

The "less precise procedure" sought to be avoided was the litigation that would necessarily follow from having to prove just what constituted "manifest impediment."[7] It will be noted that Article 43(d), UCMJ, retained the practice of excluding periods in which an accused is absent from the jurisdiction of the United States. It specifically rejected the "manifest impediment" exclusion, opting instead to specify two additional exclusions.

## II

We have more fully developed the historical background of the evolution of Article 43, UCMJ, in order to evidence what we believe might have been an undue emphasis placed by the Court in *Rice* upon the drafters' search for a more precise manner of tolling the statute in the context of the *Rice* reference to "a particular summary court-martial authority." In *Rice,* the Court

6. Index and Legislative History, Uniform Code of Military Justice, at 1035.

7. As an example of how the issue of manifest necessity became relevant to whether the statute of limitations was tolled as to an offense, consider the following: A soldier became an absentee on 1 January 1930 and the period of absence did not terminate until 31 November 1938. The statute of limitations under AW 39 provided for a 2 year period of limitations for unauthorized absence. The soldier was arraigned on 31 December 1938. At the time of arraignment the statute was tolled. However, the Government then had the burden of proving by a preponderance of the evidence why they were unable to obtain custody over the soldier within the two years commencing on 1 January 1930—that is, what "manifest impediment" existed which precluded or made impossible obtaining such custody. In the example, requiring the Government to marshall evidence extending back through the preceding 8 years to prove "manifest impediment" became, in itself, a manifest impediment to prove a proper tolling of the statute of limitations. In essence, the longer a member was an unauthorized absentee, the better chance he had to totally avoid prosecution.

sought amplification for the phrase "an officer exercising summary court-martial jurisdiction over the command" from Paragraph 33, *Manual for Courts-Martial, 1969 (Rev.)* (MCM). The opinion, by its reference to the word "particular", seemed to suggest that the only officer so empowered to act in that capacity is the immediate commanding officer of the activity or unit to which an accused servicemember is attached. Appellant has, at times during the appeal process, argued for such a constricted interpretation, by his reference to Article 25(c), UCMJ, 10 U.S.C.A. § 825(c) and its usage of the term "unit." On other occasions, as in the appellate brief, he has conceded the contrary. In order to fully dispose of any suggestion that "*an* officer exercising summary court-martial jurisdiction over *the command*" is limited to but one official—"*that particular* summary court-martial authority under whose command an accused was attached at the time sworn charges were received"—we address the issue.

The legislative determination as to the identity of "an officer exercising summary court-martial jurisdiction over the command" has not changed since the inception of the Code in 1951. Furthermore, it is clear that the interpretation placed upon that phrase in Article 43, UCMJ, as now expressed in Paragraphs 68c and 215, MCM, has not altered during this period. Paragraph 68c, *Manual for Courts-Martial, United States (1951), (MCM (1951)),* provided as follows:

> The period of limitation begins to run on the date of the commission of the offense. With respect to liability to trial by court-martial, it ends when sworn charges and specifications are received by *any* officer exercising summary court-martial jurisdiction over the command which includes the accused. *See* 33b and Art. 24. (Emphasis added).

The emphasized portion of the quoted language supports the proposition that no one specific officer in command was the only officer in command, possessing the requisite Article 24, UCMJ, 10 U.S.C.A. § 824 authority, who could receive charges. Arguably from this language, any officer who possessed such jurisdictional authority could so act if but one additional prerequisite were present—that he exercised that authority over the command which includes the accused. Applying even the most restrictive interpretation, we conclude that, at the very least, the concept of chain of command was contemplated by the drafters of Paragraph 68c, MCM (1951). Specific reference is made to Article 24, UCMJ, which sets forth who possesses such jurisdiction. Often overlooked in that Article, however, is the ultimate sentence:

> Summary courts-martial may, however, be convened in any case by superior competent authority when considered desirable by him.[8]

■ There should be no dissent from the proposition that the term "superior competent authority" necessarily includes *any* officer superior in the chain of command to the officer exercising immediate summary court-martial jurisdiction over an accused. *See,* for example, sections 0108 and 0116, Manual of the Judge Advocate General (JAGMAN). If, therefore, the Code permits a superior competent authority to withhold the exercise of court-martial jurisdiction by his subordinates, it must, as a logical extension of this power, authorize him to perform, or cause to be performed, all ministerial and non-judicial functions which are requisite to the act of convening—such as the receiving of sworn charges pursuant to Article 43(c), UCMJ. The power to exercise summary court-martial jurisdiction, under Article 24, UCMJ, is virtually synonymous with the power to convene a court of that kind. The authority to receive sworn charges under Article 43(c), UCMJ, is also derived from Article 24, UCMJ. Therefore, it is clear that the power to

---

8. Article 22 and 23, UCMJ, 10 U.S.C.A. §§ 822, 823 confer similar authority as to general and special courts-martial, respectively.

receive sworn charges is a necessary incident of the power to convene.

■ That being so, we hold that *any* superior competent authority can receive sworn charges as *an* officer exercising summary court-martial jurisdiction over the command which includes the accused.

### III

■ While not necessary to our holding in the present case, we conclude that Article 43(c), UCMJ, does not limit the power to receive sworn charges to those officers within the chain of command concept. The chain of command, of course, contemplates a vertical structure. We believe a lateral transfer of the power to receive sworn charges and convene an appropriate type court-martial is not only permitted by the Code and MCM but is also provided for by Paragraph 33*i*, MCM:

> When trial by special or general court-martial is deemed appropriate and he is not empowered to convene such a court for the trial of the case (5a, b), he will forward the charges and necessary allied papers, in accordance with regulations of the Secretary concerned, to an officer exercising the appropriate kind of court-martial jurisdiction. If, however, the forwarding officer is an accuser (5a(4)), the court must be convened by a competent authority superior in rank or command.

Pursuant to this grant of Presidential authority, lateral transfer of the power to convene has been authorized by sections 0108 and 0116, JAGMAN.[9] As long as regulations issued by the Secretary so provided, a lateral transfer for purposes other than those described in sections 0108 and 0116, JAGMAN would be permissible—without regard to whether the officer to whom the charges were forwarded was senior or junior in rank or command to the transferring official. What is eminently

clear from a reading of both MCM and JAGMAN provisions is that an orders-type transfer of the individual accused is not a requisite to the lateral transfer of the power to convene a court of that accused. Of course, the power to convene carries with it the power to receive sworn charges.

### IV

In consequence of the numerous ancillary issues raised in appellant's oral argument, we are not yet at liberty to depart from our consideration of the impact of *Rice*. Building upon the reference in that decision to the legislative history of Article 43(c), UCMJ, appellant has suggested that the drafters of the Code, concerned with the prospect of a "desk drawer" mania whereby storing up of dust-covered charges would result, conceived of the immediate officer exercising summary court-martial jurisdiction as the panacea. To address this contention, we make another foray into the abyss called legislative history.

Appellant's analysis does not go far enough. The real concern of the drafters was that an *accuser* could sign charges, place them in his desk, and, some years later, revive them against an accused. In this regard we note that the filing of the indictment in civil jurisdictions was the procedural pattern they attempted to emulate. Filing, not receipt by a designated official, was the act which tolled the statute as to an indictment. To remove the potential for abuse in the military system, the drafters modified the indictment process and injected the requirement that, in addition to signing the charges (the preferral process), charges must be presented in due course to an officer exercising the expressed statutory jurisdiction. The following comments of Mr. Larkin are enlightening:

> However, we were concerned in adopting this provision, and I think some witness suggested it to the committee, that it

**9.** Section 0108 provides for lateral transfer, when the normal convening authority is an accuser, to the area coordinator for convening the court. If that area coordinator is not superior in rank or command to the accuser, or if it is impracticable to forward the charges to the area coordinator, then the charges will be forwarded to *any* superior officer exercising the appropriate court-martial jurisdiction. Section 0116d(2) provides for transfer of charges up the chain of command *or* laterally to an area coordinator.

might be subject to abuse. Inasmuch as any person subject to the code can sign charges, it might happen that someone might draw up charges and sign them and put them in his desk. In other words, in order to toll the statute he could sign charges, put them in his desk, and then confront the person with those charges several years later. Several years later the accused would not have the opportunity of invoking the statute of limitations.

In order to preclude that possibility, we have provided, as you see here, that the statute is tolled only upon receipt of the sworn charges and specifications by an officer exercising summary court-martial jurisdiction.

Unless the accuser forwards the charges after he signs them to an officer exercising summary court-martial jurisdiction, who is, under the present practice, the next normal step, such signing of charges would not toll the statute. They would only be so effective if they are formally in the due course of business transferred to the summary court officer. It at least would prevent a person from writing up charges and then putting them in his desk and tolling the statute.[10]

This apprehension over a "salt away" philosophy was also expressed in the context of defining this codal creature called "an officer exercising summary court-martial jurisdiction over the command." The concept was not new to military law, it being articulated in the *Manual for Courts-Martial,* U.S. Army (1949). However, its application to all the services and the tasking of that official, as the buffer against "desk drawer" abuses, as the authority to receive sworn charges was wholly exploratory in a statutory scheme. A major concern of the drafters was the identity of this officer during wartime or when a command was deactivated.[11] What is clear from the discussion on this issue is that the concept of "command" as used in Article 43(c), UCMJ,

was much broader than the immediate unit to which an accused was attached. In fact, a sound argument can be advanced that, as envisioned, it was not necessarily contained within the bounds of the chain of command structure. One of the drafters, Mr. Elston, suggested that, for deactivated commands, "the filing of charges with the Judge Advocate General would suffice."[12] Later discussion of this dilemma reveals the philosophical resolution—charges could be filed with the custodians of the service record in the respective services, for example, the Chief of Naval Personnel and the Adjutant General of the Army. Surely if the drafters only contemplated a vertical chain of command concept, let alone one restricted to the immediate officer possessing the requisite jurisdiction over the accused, the offices of the Chief of Naval Personnel and Adjutant General, neither of which is within such a chain, but, rather, is lateral to that chain, would not have been agreed to as acceptable repositories to receive sworn charges and thus toll the statute of limitations.

That the Chief of Naval Personnel was recognized, *in every case in which a member of the naval service was declared a deserter,* as a proper official to receive sworn charges is evident from the following comment of Mr. Smart, one of the drafters of the Code who had been most vocal in the expression of reservations on the issue of who would receive sworn charges:

> You will recall that I raised an objection to the particular wording here (Art. 43(b) and (c)) because I felt that it was a nebulous place to hook on the statute of limitations by having charges and specifications received by an officer exercising summary court-martial jurisdiction over the command.
>
> I doubt that I had as complete an understanding of the situation at that time as I now have. I find that in the event of, we will say a Navy enlisted person, if he is A.W.O.L. in excess of 10 days he goes

**10.** Index and Legislative History, UCMJ, at 1035.

**11.** Ibid. at 1039–1043.

**12.** Ibid. at 1040.

into a straggler status and if he continues to be A.W.O.L. for as much as 30 days *he then goes into desertion and his file goes to the Chief of the Bureau of Personnel.* (Emphasis added).[13]

The procedure as to deserter status then in effect in the naval service, which prompted this comment, was continued under the Code. The legislative history to Paragraph 68c, MCM (1951), contains the following observation:

> In effect (the tolling of the statute of limitations upon receipt of sworn charges by an officer exercising summary court-martial jurisdiction) may mean that there will be virtually no statute of limitations as to AWOL and desertion cases if departmental regulations will authorize the forwarding of charges to the various departments when the absentee is dropped from the unit as a deserter. When they are received by the Secretary of the Department (who exercises summary court-martial jurisdiction over the command which includes the accused) or his representative, the running of the statute is stopped. *See 30e.*"

Paragraph 30e, MCM (1951), provided, in pertinent part:

> The preferring of charges . . . is of particular importance . . . in a case involving an offense committed by an accused who is absent without authority. Unless otherwise directed, the charges and allied papers in such a case *will be held with the service record of the accused pending his return to military control.* (Emphasis added).

### V

 The conclusions to be reached upon consideration of the referenced comments, history, and manual provisions are compelling: In the case of a Navy absentee or deserter, the charges and allied papers will be held with the service record of the accused. Any officer properly in possession of the service record of such an accused, whether for administrative purposes only or as the commander of the command to which that accused is attached, if he is also empowered to exercise summary court-martial jurisdiction, can properly exercise that jurisdiction over any accused whose service record he holds. He, therefore, can receive sworn charges in that capacity and toll the statute of limitations. A permissible means of effecting compliance with Article 43(c), UCMJ, in the case of a Navy deserter is to provide, by Departmental regulations, for the forwarding of the service record to the Secretary of the Navy, who exercises summary court-martial jurisdiction over all commands within the naval service. The Secretary, rather than exercising this authority personally, can delegate it to his representative within the Navy Department, who independently exercises such court convening authority. The receipt of sworn charges by that representative, when he is also the custodian of the service record of the deserter, acts to toll the statute of limitations in the respective case. We so hold.

 In this context, we also hold that, under the delegation of authority provisions contained within U.S. Navy Regulations, 1973, and considered in light of the broad grant of power by the Secretary of the Navy, via the Chief of Naval Operations, to the Chief of Naval Personnel, as reflected in OPNAVINST 5430.47, the Secretary of the Navy has in fact, in the case of deserters, delegated his power to act as the officer exercising summary court-martial jurisdiction over all commands of the Navy to the Chief of Naval Personnel as his representative. *See* Sections 0101, 0104, 0304, and 0307, U.S. Navy Regulations.

### VI

We have therefore to consider whether the Chief of Naval Personnel has established regulations which either expressly, or by clear implication, implement this granted authority, or, whether, to the contrary, a regulation has procedurally been promulgated by him, with the intention of imple-

---

**13.** Ibid. at 1264.

menting Article 43(c), UCMJ, which seems to restrict his power to act as the officer exercising summary court-martial jurisdiction over "all commands" in the naval service in the case of deserters. This consideration necessarily becomes relevant by virtue of the following statement in *Rice:*

> The customary application of a regulation primarily concerned with procedures governing the organization and management of the agency will be accorded great weight by reviewing authorities. Nevertheless, that practical construction may not be dispositive where contrary to the underlying administrative purpose of the regulation.

*Rice, supra,* at 607–8.

Appellant contends that Section 3430100.-8.c., BUPERSMAN, is such a restrictive regulation, that it, like the provision in the IRAM in *Rice,* was intended to establish an administrative procedure designed to "implement the mandate expressed in Article 43(c), UCMJ," and thus, it acts to preclude even the Chief of Naval Personnel, who administratively holds the service record of and maintains accountability for a deserter, from receiving sworn charges because the noted BUPERSMAN provision does not allow for a transfer of a deserter from the ship or mobile unit "to which he is attached." The latter quoted language obtains significance in the context of the assigned error only because it, and the overly restrictive manner in which it was interpreted in *Rice,* became the linchpin of that decision.

Section 3430100.8., BUPERSMAN, in effect on 31 July 1978, provided:

8. The Chief of Naval Personnel considers that, as a general rule, a member is attached to that ship or station to which he or she is administratively assigned. The following are exceptions:

a. A member who absents himself/herself or deserts while enroute to the next naval activity to which ordered to report is considered attached to the activity to which ordered to report even though such activity may be an intermediate reporting activity.

b. A member who absents himself/herself or deserts while on board a naval vessel for transportation between stations is considered attached to the transporting vessel.

c. A member who absents himself/herself from a ship or mobile unit is considered attached to such ship or mobile unit notwithstanding transfer of records.

Appellant construes subsection 8.c. above to mean that where a servicemember is attached to a ship or mobile unit, then only the immediate commander of the ship or mobile unit who exercises summary court-martial jurisdiction over him (or, when so conceded by appellant, a superior competent authority over that command) can properly receive sworn charges for the purpose of tolling the statute of limitations. This construction obviously stems from interpreting the phrase "notwithstanding transfer of records," in the context of "administratively assigned," to mean that a transfer of records of that deserter for administrative purposes to CHNAVPERS does not divest the commander of the command to which the deserter is attached of summary court-martial jurisdiction, and thus does not vest CHNAVPERS, or his delegate, with the power of an officer exercising such jurisdiction as to that deserter.

## VII

Appellant has suggested that a plain reading of the quoted provision would support his theory of "limited jurisdiction." Assuming for the moment that some degree of relevance between the quoted provision and Article 43(c), UCMJ, exists, we disagree and, in fact, conclude the contrary.

The "plain reading" rule is well stated in *United States v. Davis,* 12 U.S.C.M.A. 576, 578, 31 C.M.R. 162, 164 (1961):

> The language does not appear to be of doubtful or obscure meaning nor subject to more than one construction and, of course, the rule is well settled that a plain and unambiguous statute is to be applied, not interpreted. Where no ambiguity is apparent there is no reason to resort to rules of statutory construction, which are

intended to remove—not create—doubt. (Citations omitted.)

█ Is Section 3430100.8., BUPERS-MAN, sufficiently clear as to admit of but one construction? We believe so. It will be noted that subsections a. and b. apply the exception to the general rule to both absentees and deserters. Subsection c, by its very language, *applies only to absentees.* Deserters are not encompassed within the reach of that subsection. To remove the potential cloud of semantics, we refer to the entirety of 3430100. Subsection 1 defines "absentee" as one, not administratively declared a deserter, who absents himself without authority. "Deserter" is defined as one who has been administratively "classified" as such. Subsection 2 specifies when an absentee will be administratively declared a deserter: when absent without authority over 30 days, when the facts and circumstances indicate that a violation of Article 85, UCMJ, 10 U.S.C.A. § 885, may have been committed, or when an absentee goes to or seeks asylum in a foreign country. The distinction in definition, and application, is retained throughout the entirety of Section 3430100: Subsections 3 through 7 refer explicitly to "absentees and deserters" or "absentees or deserters." The conclusion is compelling that the drafters fully intended to maintain this distinction by specifically referring to each classification where considered applicable. Subsection 8 is the first departure from the uniform joining of absentees and deserters. On its face, therefore, and in the context of all preceding references which specify the two separate classifications with particularity, we must conclude that, contrary to appellant's contention, Subsection 8.c. ceased to apply to his case immediately upon the 31st day of his continuous absence—when by statutory definition he became, administratively, a deserter.

This conclusion that Subsection 8.c. was not intended to reach administratively declared deserters is buttressed by reference to the BUPERSMAN provision in effect immediately prior to the change which resulted in 3430100.8., as quoted. Subsection

a. and b. of the BUPERSMAN, effective October 1977, contained the identical language as the provision at contest. Subsection c. stated:

A member who absents himself from a ship or mobile unit, *unless declared a deserter,* is considered attached to such ship or unit notwithstanding transfer of records. (Emphasis added.)

What is virtually a compelled inference is that, when Subsection c. was redrafted, under date of change July 1978, the underlined language was omitted, it being repetitive of the exclusion already manifested by the absence of the phrase "or deserter" from that subsection.

### VIII

Though, on the basis of the unequivocal limitation noted above, we now hold that appellant can not successfully urge the application of Subsection 8.c. in his behalf, we feel it necessary to explore the vagaries of interpretation which have been advanced as to this particular provision. Guidance for this venture into statutory construction is provided by the following common sense approach suggested in *New York State Commission on Cable TV v. FCC,* 571 F.2d 95, 98 (2d Cir.1978), *cert. denied,* 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978):

Mere incantation of the plain meaning rule, without placing the language to be construed in its proper framework, cannot substitute for a meaningful analysis. For we must remember Judge Learned Hand's stricture that '[t]here is no surer way to misread any document than to read it literally....' [cites omitted]. And as Professor Cox wisely noted, '[n]o one has ever suggested that the courts must always follow the letter of a statute regardless of outcome, nor does any one contend that the words may be entirely disregarded. The issue is where to strike the balance.' .... The appropriate methodology, then, is to look to the 'common sense' of the statute or regulation, to its purpose, to the practical consequences of the suggested interpretations, and to the agency's own interpretation for what

light each inquiry might shed. [Citations omitted].

The Government has provided us with an "interpretative" affidavit of the Head of the Deserter Branch, NMPC, the office which has the responsibility for the administration of the Navy's deserter apprehension program. *See* Appendix I. We note the following comment by that officer: "Paragraph 8.c. of Section 3430100 actually deals with the situation where an absentee is gone less than 180 days. It was never intended to deal with absences lasting more than 180 days." Appellant argues, in reply, that 8.c. "would only make sense if it applied after 180 days have elapsed. Since the command is holding the absentee's records for 180 days before transfer of the absentee's records pursuant to Article 3430250(2)(a), and because Article 3430100(8)(c) deals only with which unit the absentee is attached to after the transfer of the absentee's record, then Article 3430100(8)(c) is mainly relevant after 180 days."

█ Though an agency's interpretation of its own regulations is entitled to great weight, it is not conclusive, especially where it appears at variance, though not necessarily inconsistent, with the context in which the regulation is used. We believe both affiant and appellant misread the scope of 8.c. In part, that misconception arises from the fact that both sides to this litigation are ascribing to the so-called "180 day rule" an importance and relevance which it does not deserve. Both the affidavit and appellant's reply loosely use the term "absentee" in the context of the 180 day rule. We have previously shown that "absentee" and "deserter" are words of art with technical meanings in the administrative scheme of Section 3430100. An absent member is an "absentee" only up to the 31st day of continuous absence. On and after the 31st day he is, by administrative definition, a deserter. Initial perceptions to the contrary, this clarification is not a meaningless gesture lacking in significance, for only by 'devoutly adhering to the statutory definition of these terms can we glean the meaning of the

provisions in the context in which they are used—or in which their absence is so glaringly self-evident.

To resolve this controversy as to the implications of the "180 day rule" to the issue addressed in this case, it is not inappropriate to discuss the genesis of that rule and determine whether it arguably has any application either to the interpretation of the phrase "notwithstanding transfer of records" as used in 8.c. or as a regulatory explication intended to procedurally implement Article 43(c), UCMJ.

The *purpose* underlying the adoption of the 180 day rule is best explained in the NAVOP of 4 November 1977 (125/77) which promulgated what would become the provisions governing the 180 day rule now in contest:

> This NAVOP provides revised policy guidelines and administrative procedures *for the return of deserters to their parent command.* A recent increase in the numbers of personnel in a deserter status has necessitated a change in policy with respect to disposition. Previously, personnel in a deserter category were retained onboard designated processing activities for disciplinary action, return to duty or separation. However, statistics indicate that personnel have deserted using this policy as a means to get a change in duty and/or coast of choice, or to avoid a deployment. To deter these actions and to alleviate increased workloads at processing activities, the policy included herein requires deserters to be returned to the parent command for appropriate disposition when the absence is less than 180 days. (Emphasis added).

The *sole expressed purpose* for the adoption of the rule is clear: to deter the increase in deserter personnel by changing the manner of disposition of such cases. The NAVOP established a procedure for personnel accounting and management to effectuate *only* this purpose. Lacking from this statement of intent is any indication of a secondary purpose to procedurally implement Article 43(c), UCMJ, or alter the then existing practice for tolling the statute of

limitations. The intended total control over the deserter situation to be assumed by the Chief of Naval Personnel could not be more evident. No longer were deserters to be dropped from the command to CHNAVPERS upon an administrative declaration of that status. The service records of deserters were now to be retained on board the command to which attached until the passage of 180 days. On the 181st day of continuous absence, the record was to be forwarded to CHNAVPERS.[14] Prior to the NAVOP change in policy, a returned deserter was always transferred to the nearest shore activity for disciplinary action—even if the period of absence was but 31 days.[15] The 180 day rule modified this practice. The general rule became that if the period of the deserter's absence was less than 180 days, he was returned to the unit from which he absented himself. If the period was of 181 days or more, he was to be transferred for disciplinary action to the major disciplinary activity nearest the homeport of his parent command.[16]

In the context of the issue before us, perhaps the most important change effected by the NAVOP was in the manner of handling personnel accounting. Prior to the NAVOP, upon the declaration of desertion, the absent member was dropped by CHNAVPERS from the Enlisted Distribution Verification Report (EDVR) of the command to which attached, making that command eligible to receive replacements effective upon the date of deserter declaration. In concert with this, the service record of the deserter was transferred to the Bureau of Naval Personnel. The NAVOP altered this practice in a significant way. Though eligibility for replacement personnel still ripened as of the date of the declaration of desertion, the deserter continued to remain on the EDVR in an administrative status only. On the 181st day of continuous absence, or when otherwise deemed

appropriate, CHNAVPERS removed the member from the EDVR of the command to which the deserter was attached. The member was thereafter assigned to an activity under the command of CHNAVPERS.[17]

We would search in vain to find a more explicit statement of intent to divest the command to which the deserter was attached of all accountability, responsibility and command authority, for and over that deserter. CHNAVPERS had the authority to promulgate and thereafter implement the procedures attendant to maintaining and administering the EDVR of all activities in the naval service. Thus, that official, or his delegates, had the authority, *then made necessary,* to effectuate a complete transfer of that deserter to some other command—to include any activity under his command, such as NMPC.

## IX

Appellant has suggested that CHNAVPERS has no such authority and that any act performed with the purported intent of effecting such a transfer is *ultra vires.* We need only refer to OPNAVINST 5430.47 to prove the contrary. The mission and functions assigned to CHNAVPERS by the Chief of Naval Operations are sufficiently broad so as to encompass the authority to transfer any servicemember under the guidelines established by the BUPERSMAN. The power being properly granted, it is necessary that the means to facilitate its execution be inferred. Removing a deserter on the 181st day from the EDVR of the activity to which that deserter was attached completely severs any command relationship between the two. If CHNAVPERS does not possess the authority to thereafter assign that deserter to a different command, to whom does the des-

14. *Compare* Sections 3430100.9 and 3430250.-3.e, BUPERSMAN as updated on October 1977 with Sections 3430100.9 and 3430250.2.a. and 3.c. of that Manual as updated in July 1978.

15. *See* Section 3430300.4. in effect in October 1977.

16. BUPERSMAN, Section 3430300.4 in effect in July 1980.

17. *See* BUPERSMAN, Section 3430250.3.f. and Appendix 1.

erter then belong? It is a proposition too well accepted, and one from which no exception can be conceived, that all active duty military personnel are attached to some identifiable command for every day of their service obligation. CHNAVPERS, under the general grant of power referred to, does possess the authority to effectuate a complete transfer of a deserter to an activity under his command. As this power, pursuant to OPNAVINST 5430.47, can be legally delegated to subordinates of his command, it is proper that the assignment function be performed by the delegate of that power—Commander, NMPC. Once performed, the deserter thereafter becomes "attached to" the activity to which transferred by NMPC.

▉ Appellant properly concedes that Commander, NMPC, is an officer exercising summary court-martial jurisdiction. The power to exercise is most often associated with the power to convene. However, as we have previously noted, both powers being derivatives of the grant established by Article 24, UCMJ, the power to receive is a necessary incident of the power to convene. The charge sheet, as demonstrated, yields clear evidence, still unrebutted, that Commander, NMPC exercised such jurisdiction over appellant both in perfecting the preferral of and in receiving sworn charges in his case. It is settled law that the act of receiving sworn charges can be performed by one not possessing the requisite jurisdiction if acting "for" one who does. *United States v. Johnson,* 10 U.S.C.M.A. 630, 28 C.M.R. 196 (1959). Furthermore, as stated in *Johnson:*

> While it is contended there is no showing of the delegation of authority by the Commander, in our early case of *United States v. Masusock,* 1 U.S.C.M.A. 32, 1 C.M.R. 32, we first applied the Federal rule of the presumption of regularity that attaches to military officials in the conduct of administrative affairs. There we noted in connection with morning reports that, although not signed by the commanding officer, the delegation of authority from him to the signing officer need not affirmatively appear in order to render such report admissible in evidence.

*Johnson, supra,* at 199. As now resolved, we believe that the rationale expressed in *United States v. Lemarbe,* 11 M.J. 864 (N.M.C.M.R.1981) concerning the application of the presumption of regularity is persuasive.

That Subsection 8.c. was not drafted with the 180 day rule in mind is eminently clear from the fact that its substantive presence within the general regulation in question antecedes the formulation and promulgation of that rule.[18] This being true, it is most difficult to ascribe to the term "notwithstanding transfer of records" a meaning which requires the existence of the 180 day rule to obtain substance. If we remain true to the plain meaning rule, it is obvious that this term has reference only to transfer of the records of an absentee—not a deserter.

## X

We believe another basis exists for finding the issue raised in this case to be without merit—the concept of waiver.

▉ The *sua sponte* duty of a military judge, or president of a special court-martial without a military judge, to advise an accused of his right to assert the statute of limitations is clear. This duty has long been the settled and enunciated practice by courts-martial. *See* paragraph 68c, MCM, 1969 (Rev.); paragraph 68c, MCM, (1951); paragraph 67, MCM, U.S. Army, 1949. Though no explicit direction in this regard is contained in Article 43, a review of the legislative history of the Code makes it abundantly evident that the drafters were not only aware of the Army practice whereby "the court" advised the accused of the statute of limitations defense but also expressed their approval of that practice "as a sound basis for similar provision(s) to ap-

---

**18.** *See* BUPERSMAN, Section 3430100.8 in effect on October 1977.

pear in the new Regulations."[19] Thus, the duty does in fact have its origins traceable to the Code.

The obvious question is: Under what circumstances does that duty arise? We find guidance to answer this question in the history of the above referenced Manuals for Courts-Martial. Paragraph 67, MCM, U.S. Army, (1949), provided:

> If it appears from the charges that the statute has run against an offense or (in the case of a continuing offense) a part of the offense charged, the court will bring the matter to the attention of the accused and advise him of his right to assert the statute.

Paragraph 68c, MCM (1951), adopted this provision but with an added qualification:

> The termination of the period of limitations may be proved, *prima facie,* by the signed receipt for the charges and specifications prescribed in 33b.
>
> . . . . .
>
> *If it appears from the charges* that the statute has run against an offense ... the court will bring the matter to the attention of the accused and advise him of his right to assert the statute unless it otherwise affirmatively appears that the accused is aware of his right in the premises. (Emphasis added.)

The language emphasized above was expanded in the 1969 Manual as follows:

> When it appears from the charges or *from the evidence introduced at the trial* that the statute has run against an offense ... (Emphasis added.)

The purpose stated for this expansion was "so that the direction to advise the accused is applicable in either event."[20]

■ A plain reading of the underlined phrases suggests that a statute of limitations defect must be patent or made evident at some time during the trial—either by mere reference to the "receipt" block in the charge sheet or as a result of evidence

admitted. Thus, where such defect is not so patent or evident, the duty to advise under Paragraph 68c, MCM, does not arise. Article 43(c), UCMJ, is indeed statutory—not constitutional. Therefore the statute which grants a right, not otherwise required by the law or Constitution, can also place limitations upon the exercise of that right.

If this indeed be a limitation on the duty to advise, and since it is not contained in Article 43, UCMJ, we must ask whether this is an invalid restriction because it is at variance with a seemingly unrestricted Codal provision. *See United States v. Douglas,* 1 M.J. 354 (C.M.A.1976). We conclude that not only is it not at variance with the Code but also that the restriction is incorporated by reference within the Code. We return to the legislative history of the UCMJ for evidence in support of this position. Above we alluded in part to the expressed intent of the drafters of the Code to adopt and approve certain procedural provisions of the MCM, U.S. Army, 1949, and recommend that they be continued in effect. We now set forth the full statement of that intent:

> The provisions contained in chapter XIII of the Manual for Courts-Martial, United States Army, 1949, dealing with the procedure for raising special defenses and objections by motion, were considered by the ad hoc committee in connection with this article (Article 45) and approved as a sound basis for similar provisions to appear in the new Regulations. The ad hoc committee also considered, and approved, the provisions in the 1949 Manual for Courts-Martial requiring that *if it appears from the charges* that the statute of limitations has run against an offense, or in the case of a continuing offense, a part of the offense charged, the court will bring the matter to the attention of the accused and advise him of his right to assert the statute.[21] (Emphasis added).

---

**19.** Discussion of Article 45, UCMJ, 10 U.S.C.A. § 845, in Index and Legislative History, UCMJ, at 21.

**20.** Analysis of Contents, *Manual for Courts-Martial, United States, 1969 (Rev.).*

**21.** Discussion of Article 45, UCMJ, in Index and Legislative History, UCMJ, at 21.

Thus, Congress, in enacting the UCMJ as law, not only was aware, but fully approved, of what we perceive as a common sense limitation on the duty of the court—be it composed of military judge or president—to *sua sponte* advise an accused of his right to assert the statute of limitations. The law of the crystal ball was clearly not intended. A military judge, or president of a court sitting without a military judge, is not required, when he has received *prima facie* evidence of compliance with Article 43(c), UCMJ, as revealed by the charge sheet, to nevertheless conduct an independent inquiry into the legitimacy of this stage of the process whereby a case is brought to trial. He is entitled to properly presume the regularity of the matter asserted within the charge sheet concerning qualifications to act in the capacity represented and, in the absence of evidence to the contrary, conclude it to be proof of the representation. To hold otherwise is to render nugatory both the clear language of limitation contained within the MCM and the expressed intent and recommendation of Congress. If an accused, therefore, elects not to pierce the veil of regularity presumed, we must conclude that his election is a knowing waiver.

We are satisfied that waiver is appropriate under such circumstances. Paragraph 68c, of both the MCM (1951), and the MCM, 1969 (Rev.) provides:

The defense of the statute of limitations generally is raised by a motion to dismiss. However, the defense also may be raised under a plea of not guilty by introducing evidence during the trial in those cases involving contested issues of fact which must be considered by the members of the court in connection with the issue of guilt or innocence.... In such a case, however, the accused should advise the military judge or the president of a special court-martial without a military judge that he is insisting upon the defense of the statute of limitations under his plea of not guilty, as a failure to assert the defense during the hearing may constitute a waiver.

■ The reason for finding waiver where the accused does not advise the court that he is relying on the statute as a defense is obvious. The court is not, under that circumstance, put on notice of a potential violation of Article 43(c), UCMJ because such does not arise in the context whereby, absent total clairvoyance or needless litigation in every case brought to trial after the statutory period has passed, it "appears from the charges or from the evidence introduced at the trial that the statute has run." Without such notice, the court is unable, and is not required, to fulfill its statutory duty of advice. The same result must obtain where the *prima facie* evidence of compliance with the statute and the presumption of regularity which attaches to the receipt of charges have been neither attacked nor rebutted prior to entry of a finding of guilty.

## XI

Appellant, in the course of the present appeal, has intimated that receipt of sworn charges by an officer who, though empowered to perform that function by virtue of Article 24, UCMJ, does not hold a superior position "over the command" which includes the accused is an act void for lack of jurisdiction. If by such reference he means a jurisdictional defect arises such as is reachable by the procedures of Paragraph 68a, MCM, we disagree. First, a violation of Article 43(c), UCMJ, can, under the circumstances described above, and as enunciated in Paragraph 68c, MCM, be waived. In contrast, a defect premised on Paragraph 68 a can never be waived—even at the behest of an accused. Second, the defects covered by Paragraph 68a are limited to the three requisites set forth in Paragraph 8, MCM.

■ Though, as we have held, both the power to convene and the authority to receive sworn charges are derivative of the statutory authorization of Article 24, UCMJ, the legal nature of the acts performed are markedly dissimilar. The power to convene is quasi-judicial in nature and cannot under any circumstances be delegated. If *United States v. Johnson, supra,*

teaches us anything it is that the power to receive sworn charges is ministerial in nature and can be delegated to a subordinate. Thus it is clear that a jurisdictional issue, within the meaning of Paragraph 68a, MCM, is not presented.

## XII

Appellant has also contended that, even assuming that the grant of authority is sufficiently broad as to authorize CHNAVPERS or his delegate to receive sworn charges in a deserter case, two requisites are necessary before the authority can be exercised: (1) a specific regulation, such as the IRAM purportedly pretends to be, which prescribes procedures for implementing Article 43(c), UCMJ, and, (2) written orders in the name of each affected deserter to effectuate the transfer of the member to the command of CHNAVPERS. As to the first suggested requisite, it appears that appellant is asking us to read a requirement for implementing procedures into the Code and MCM beyond those already set forth. This we decline to do. We are not in the personnel management business—nor should we be. That the Marine Corps may have deemed it desirable to establish such a practice provides no sound basis for our declaring it to be mandatory—or even advisable—in the naval service.

 The second suggested requisite is premised in part on certain provisions in the BUPERSMAN which refer to the requirement for written orders to transfer a servicemember. The argument that flows from this premise is based on the "well settled" rule enunciated in *Rice* that an agency is bound to follow its own regulations where the protection of personal rights or interests are the underlying purpose for promulgation of the regulation. Though we believe this oft-quoted "rule" has been severely over-extended in usage, an issue perhaps better left for resolution when more properly at issue, we have no reservations in applying the rule as stated to the contention addressed. In so doing, we fail to see what personal right or interest of a deserter is even remotely protected by the requirement for written orders where his absence makes delivery to him of those orders impossible. The procedures adopted, as set forth in the affidavit (Appendix I), seem eminently well-suited to meet the interests of the Government—the only real interest involved in the debate over methodology of effectuating a transfer.

An off-shoot of the "well-settled" rule, which also finds its genesis in *Rice,* is the contention that as the statute of limitations is designed to protect the accused as well as the Government, and as such statutes are to be liberally construed, any regulation which "may be construed" to benefit the individual should be given an interpretation to effectuate that benefit. Contrary to its purported attempt to avoid deciding the issue, the Court in *Rice* went further than merely "assuming, arguendo" that Article 43(c), UCMJ, conferred a benefit upon the accused—to obtain the result reached required that they so hold. We express no disagreement with such a holding as to the effect of Article 43(c), UCMJ. We even shall tread further and find that the requirement for sworn charges to be received by *an* officer exercising summary court-martial jurisdiction, as set forth in both the Code and MCM, also confers a benefit upon the accused. The legislative history is clear on this point. We will not, however, take the quantum leap, as was done in *Rice,* and hold that an accused is the possessor of a demonstrable benefit by having a particular officer possessing the requisite authority receive the sworn charges. Neither will we hold that intra-service regulations, clearly designed to "promote administrative efficiency in the management of service records," must also be read as having attached to them the underlying purpose of conferring or protecting a right or interest which benefits a deserter.

As we have discussed, the drafters of the Code sought to protect an accused from having an accuser prefer charges against him, "salt them away" in a desk drawer, and revive them years later. The concept of "officer exercising summary court-martial jurisdiction" was the vehicle chosen to

intercede in the signing process and thus elevate, from an accuser to the concept of court-martial authority, the duty and responsibility for tolling the statute of limitations. The interest of the individual at stake was to protect him from having to answer to stale charges. An officer possessing Article 24, UCMJ, powers—and responsibilities—was viewed as an appropriate official to curb such abuse. Even assuming that the law mandates receipt of sworn charges by a particular officer exercising summary court-martial jurisdiction, we fail to see what interest of an accused is affected if a different officer acts to toll the statute as long as the act is done within the statutory period and by one who possesses Article 24, UCMJ, authority. The statute is intended to protect an accused from stale charges—not from being tried. Charges, tolled within the statutory period, do not become stale merely because an officer exercising summary court-martial jurisdiction, other than the one contemplated, tolls the statute.

As to the "intra-service regulations" prong addressed, we reach the same result. In this case it has been argued that Section 3430100.8.c., BUPERSMAN, must be construed as conferring a benefit upon appellant because Article 43(c), UCMJ, confers such a benefit. The nexus is lacking. Even if read without the context of the entirety of Section 3430100 and the following related sections, subsection 8.c. does not have as its underlying purpose the protection of personal rights or interests. Nor may such a purpose be construed as emerging from its language. When subsection 8.c. is read as being an integral, but not controlling, part of the policy set forth in Sections 3430100 through 3430300, BUPERSMAN, the purposes for the regulations become manifestly self-evident: to promulgate uniform administrative procedures governing the handling and disposition of absentees and deserters, both upon commencement of the absence period and upon their return, and to establish procedures for personnel accounting and management in order to meet the mission of the U.S. Navy—not

some *de minimis,* and unidentifiable, interest of a deserter.

## XIII

■■■ In sum, as applicable to this case, we hold: That the decision in *Rice* is factually inapposite; that Section 3430100.-8.c., BUPERSMAN, is applicable only to absentees, not deserters; that a deserter possesses no articulable interest or right which is protected, or may even be so construed, by sections 3430100 through 3430300, BUPERSMAN; that the *prima facie* evidence of a proper tolling of the statute of limitations by Commander, NMPC, proves, where not rebutted prior to the entry of a finding of guilty, compliance with Article 43(c), UCMJ; that the presumption of regularity which attaches to official acts, when applied to the representations set forth in the charge sheet in this case, is sufficient proof that appellant was attached to the command of Commander, NMPC, on 9 July 1980; that a command properly in the possession of the service record and charge sheets of an accused, whether for administrative or other purposes, is the command to which that accused is attached within the meaning of Article 43(c), UCMJ; and, that, assuming there to be a defect in the process of receipt of sworn charges, since the defect did not "appear from the charges or from the evidence introduced at trial," appellant's failure to raise the issue prior to the entry of the finding of guilty constituted a waiver of his right to rely on the statute of limitations.

Accordingly, the findings and sentence as approved on review below are affirmed.

Judge BYRNE concurs.

GLADIS, Senior Judge (concurring in the result):

Concurring in parts I through IX, XI, XII, and all, except the final clause, of part XIII of Judge Barr's opinion, I join the majority in affirming the findings and sentence.

The gist of the accused's position is that the statute of limitations was not tolled by receipt of sworn charges at the Naval Mili-

tary Personnel Command (NMPC) because he was not assigned to that Command, but remained assigned to his ship by virtue of BUPERSMAN Art. 3430100.8.c., which provided that a member who absents himself/herself from a ship or mobile unit is considered attached to such ship or mobile unit notwithstanding transfer of records. For the reasons stated in part VII of the majority opinion this provision is not applicable to the accused. It applies only to absentees who have not been administratively declared deserters. Therefore, by virtue of the provisions of BUPERSMAN Art. 3430250 which provided for the transfer of the records of deserters, the accused was administratively assigned to NMPC when the charge was received. These provisions were properly promulgated in the exercise of functions delegated to the Chief of Naval Personnel pursuant to U.S. Navy Regulations, 1973, Articles 0101 and 0307 and OPNAVINST 5430.47. Thus, the statute of limitations was properly tolled. Consequently, I find it unnecessary to address the issue of waiver and do not concur in part X. In the light of the requirement in MCM, 1969 (Rev.), para. 68c for a knowing waiver of a statute of limitations defense, I refuse to join the majority in invoking the doctrine of passive waiver here.