**UNITED STATES**

v.

**James Frank TUCKER, 527 25 5800, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 83 3830.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 5 April 1983.

Decided 21 March 1984.

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

LT Mark A. Zuboff, JAGC, USNR, Appellate Defense Counsel.

LT Sandra R. Ganus, JAGC, USNR, Appellate Government Counsel.

ABERNATHY, Judge: *

Appellant, contrary to his pleas, was convicted of unauthorized absence in violation of Article 86, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886. This Court, on its own motion, ordered written briefs on the following issues:

I. WHETHER THE ENTRY ON PROSECUTION EXHIBIT 2 WHICH ESTABLISHED APPELLANT'S UNAUTHORIZED ABSENCE ALSO BROUGHT THE CASE WITHIN THE AMBIT OF THIS COURT'S DECISION IN *UNITED STATES V. RICE*, 15 M.J. 605 (N.M.C.M.R.1982)?

II. WHETHER, IF THE FOREGOING QUESTION IS ANSWERED AFFIRMATIVELY, THE *RICE* HOLDING IS CONTROLLING IN VIEW OF APPELLANT'S FAILURE TO LITIGATE AT TRIAL THE QUESTION OF WHICH COMMAND EXERCISED SUMMARY COURT-MARTIAL JURISDICTION OVER HIM AT THE TIME SWORN CHARGES WERE RECEIVED? *SEE UNITED STATES V. LEMARBE*, 11 M.J. 864 (N.M.C.M.R. 1981).

In addition, the Court, proceeding *en banc,* requested oral argument on a third issue:

WHETHER *UNITED STATES V. RICE,* 15 M.J. 605 (N.M.C.M.R.1982) WAS CORRECTLY DECIDED? *SEE UNITED STATES V. CENTENO,* 17 M.J. 642 (N.M.C.M.R.1983).

I

Summary of Facts

Appellant absented himself from his unit, Wing Transport Squadron 37, Marine Wing Support Group 37, 3d Marine Aircraft Wing, FMF Pacific, Marine Corps Air Station, El Toro, California (hereinafter, WTS-37) from 31 December 1979 until 21 December 1982. Prosecution Exhibit 2, a copy of a "Page 12" from appellant's service record book, reflected that appellant was declared a deserter on 30 January 1980 and was dropped from the unit's rolls on 3 February 1980. The charges upon which appellant was tried were received by the officer exercising immediate summary court-martial jurisdiction over WTS-37, on 30 January 1981. At trial, appellant did not move to dismiss the charges. Before this Court, however, appellant has argued that the receipt of charges was without effect in accordance with the prior decision of a panel of this Court in *United States v. Rice,* 15 M.J. 605 (N.M.C.M.R.1982).

The government, on the other hand, contends that the *Rice* case was incorrectly decided and should not control the disposition of this case.

We have considered the briefs and arguments of counsel and have determined that the resolution of these issues requires a reexamination of the major premises underlying the decision in *Rice.*

II

Summary Of *United States v. Rice*

In *United States v. Rice, supra,* as in the case *sub judice,* the charges were received by an officer exercising summary court-martial jurisdiction over the command from which the accused had absented himself. These charges were received, however, after the accused had been dropped from the unit's rolls. At trial, Rice moved to dismiss the charges based upon the government's failure to toll properly the statute of limitations. Rice, in support of his position, relied upon certain provisions of the Marine Corps Individual Records Administration Manual (IRAM) and the Marine Corps Legal Administration Manual (LEGADMINMAN) in arguing that, once he had been dropped from the rolls of his unit, the officer exercising summary court-martial authority over that unit could no longer receive

---

* Captain Kenneth L. ABERNATHY took final action on this case prior to his detachment on

29 February 1984.

charges against him. In reversing appellant's conviction, the Court reasoned that Article 43(c), UCMJ, 10 U.S.C. § 843(c), contemplates action by that particular summary court-martial authority under whose command an accused is attached at the time sworn charges are received. *Rice, supra* at 606. The Court characterized the two Marine Corps administrative directives as protective of an accused's interests by limiting the government's ability to prosecute. As such, the Marine Corps was bound to follow these directives. Once Rice had been dropped from the rolls of his unit, Marine Corps regulations precluded that command from tolling the statute of limitations. *Rice, supra* at 608.

Underlying the *Rice* decision are two premises. The first is that only one particular summary court-martial authority may receive sworn charges, namely, the summary court-martial authority of the unit to which an accused is attached. The second premise is that the cited IRAM and LEGADMINMAN provisions were specifically promulgated to provide procedural safeguards to an accused. Based upon our examination of the Code, the Manual for Courts-Martial and the Marine Corps manuals, we believe that neither premise is correct.

### III

■ Article 43(c), UCMJ, Does Not Contemplate Action By Only One Particular Officer Exercising Summary Court-Martial Authority.

Article 43(c), UCMJ provides that:

Except as otherwise provided in this article, a person charged with any offense is not liable to be tried by court-martial or punished under section 815 of this title (article 15) if the offense was committed more than two years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command or before the imposition of punishment under section 815 of this title (article 15).

The legislative determination as to the identity of "an officer exercising summary

court-martial jurisdiction over the command" has not significantly altered since the Code's inception. The interpretation placed upon that phrase, as found in Paragraphs 68c and 215, *Manual for Courts-Martial, 1969 (Rev.)* (MCM, 1969), has likewise remained constant throughout this period.

Paragraph 68c, *Manual for Courts-Martial, United States (1951)* (MCM, 1951), provided:

The period of limitation begins to run on the date of the commission of the offense. With respect to liability to trial by court-martial, it ends when sworn charges and specifications are received by *any officer exercising summary court-martial jurisdiction over the command which includes the accused.* · *See* 33b and Art. 24. [Emphasis added].

Article 24(b), UCMJ, 10 U.S.C. § 824(b) provides

... Summary courts-martial may, however, be convened in any case by superior competent authority when considered desirable by him.

■ By reference to a superior competent authority, as a party capable of convening a summary court-martial, it can also be logically concluded that such an individual also can perform functions antecedent to the act of convening, such as the receipt of sworn charges. The notion that a superior in the chain of command may receive sworn charges is consistent with both Article 43(c), UCMJ, which speaks in terms of "command" rather than "unit" or "organization", and Paragraph 33i, MCM, 1969, which implies that in some circumstances officers exercising summary court-martial jurisdiction will be able to convene special or general courts-martial. That being the case, it would stand to reason that not only an accused's immediate commanding officer but his superiors, even the Commandant or his designee, could receive sworn charges. *See United States v. Centeno,* 17 M.J. 642 (N.M.C.M.R.1983).

■ Although admittedly broad in its scope, Paragraph 68c, MCM, 1951, did provide some limitations upon the exercise of

the authority to receive charges: the command must include the accused. We interpret the concept of inclusion to mean that there must be a substantial identifiable nexus, either operational or administrative, between the officer receiving the charges and the accused. In the ordinary case, an accused's presence within a specific organization is indicative of the nexus between himself and the officer exercising summary court-martial authority over that organization. In the case of unauthorized absentees, the existence of a nexus must be determined from other factors.

## IV

Existence Of A Nexus Between An Unauthorized Absentee, And An Officer Exercising Summary Court-Martial Jurisdiction

When the unit from which a deserter absents himself utilizes the "dropped from the rolls" information to record and report to higher headquarters the status of the deserter, the electronic manpower management system can efficiently program a replacement for a marine who is likely to leave the unit understrength for an extended period of time. The system also affords the efficient centralized control in one reporting unit of all Marine Corps deserters and the management of the peculiar problems often created in their return to military control, utilizing electronic means and the existing reporting unit structure of the Marine Corps. Paragraph 4000.3, LEGADMINMAN.

In determining the true relationship between the appellant and his unit, it is significant that, as a deserter, he was not processed via "transfer" or "change station" entries and information, as is true of other transferees. Paragraph 4007, LEGADMINMAN; Chapter 5, Marine Corps Order P1080.25, Personnel Reporting Instructions Manual (PRIM). Nor was there a physical movement of the person of the appellant to another command or, upon recovery, from another command, as is the customary meaning of the term "transfer". J. NOEL & L. BEACH, NAVAL TERMS DICTIONARY (4th ed. 1978). All of the indicia of command responsibility for the appellant, such as custody of service records, pay record, health record, personal effects and re-entry to the rolls of the unit upon return to the unit remained with WTS–37. *See,* paragraph 4002, LEGADMINMAN. WTS–37 and the local command chain were possessed of uniquely accurate personal information regarding the appellant, his offense and the impact of the offense on the unit. When a deserter is recovered, he is returned to the unit from which he absented himself. Paragraph 4007, LEGADMINMAN. When the deserter returns to that unit, no authorization from Headquarters Marine Corps to rejoin the deserter to the rolls of the parent unit is required. Paragraph 4007.6, LEGADMINMAN.

The sole act which appellant contends divested the commanding officer WTS–37 of the power to toll the statute of limitations was the dropping of the appellant's name from the rolls of the unit on the 31st day of his absence in conformance with deserter record control and accounting procedures. Although "dropping from the rolls" has significant manpower management implications and convenience, such action in the totality of the circumstances is insufficient to break the factual and legal nexus between the appellant and the summary court-martial authority at WTS–37.

## V

Paragraph 4001.1 IRAM Was Not Promulgated To Grant A Procedural Right To An Accused

It is well settled that either the President in promulgating the *Manual for Courts-Martial* or the armed services in adopting regulations can go even further than the Constitution and the Uniform Code in providing safeguards for military personnel. *United States v. McGraner,* 13 M.J. 408 at 414–415 (C.M.A.1982); *United States v. Dunks,* 1 M.J. 254 (C.M.A.1976).

*Rice,* although not affirmatively so stating, apparently adopted the view that

the cited paragraph of the IRAM was promulgated to provide important procedural safeguards for an accused. Unlike the author of *Rice,* we cannot ascribe such status to the provisions of the administrative manuals at issue.

Paragraph 4001.1 as excerpted in *Rice* is incomplete and misleading. The complete paragraph is as follows:

4001 GENERAL INSTRUCTIONS ON THE CARE AND MAINTENANCE OF THE SERVICE RECORD BOOK

1. *Responsibility.* Responsibility for care and maintenance, including opening and assembly, custody, timely forwarding, making entries, etc., rests with the commander of the organization to which the Marine has been appropriately joined and is then a member. Although a custodian may be appointed to perform these functions, the commander's responsibility cannot be delegated. Responsibility for making entries includes entries concerning desertion and unauthorized absence even though such entries reflect events which may have occurred before the Marine was joined by the current organization. (See paragraph 4014 regarding unauthorized absence and desertion entries.) As provided in the Uniform Code of Military Justice, article 43, and MCM 1969 (Rev.), paragraph 68c, the responsibility for receipt of sworn charges and specifications sufficient to terminate the running of the statute of limitations rests with an officer exercising summary court-martial jurisdiction over the command. The latter is significant in connection with action in drop-

ping a Marine from the rolls; once that action is taken, an officer exercising summary court-martial jurisdiction over the dropping command is no longer empowered to terminate the running of the statute of limitations by the receipt of sworn charges and specifications preferred against the Marine. (See paragraph 4014.2a(3)(b).)

In the context of the entire paragraph, it is obvious that the admonition regarding the effect of dropping a Marine from the rolls was an explanatory part of a purely general instruction regarding responsibility for the care and maintenance of the service record book.

It is also significant that the admonition is not repeated in paragraph 4014(2)(a)(3)(b).[1] The guidelines of that paragraph stating what *should* be done if the drafting of charges is considered appropriate hardly comport with the strict regulatory interpretation placed upon paragraph 4001.1 in the *Rice* decision.

Further evidence of the limited administrative purpose of paragraph 4001.1, and the directive as a whole, can be found throughout the IRAM.

The promulgation order, for example, specifically provides:

3. *Promulgation.* The revised Individual Records Administration Manual is issued for the guidance and compliance of all individuals concerned in Marine Corps records administration. Instructions contained herein in no way amend any provisions of reference (a) through (d) or Navy Department general orders.[2]

---

1. 2a(3)(b) *Statute of Limitations.* In the case of a Marine who has been administratively declared an unauthorized absentee or deserter, the drafting and preferral of charges, under the Uniform Code of Military Justice is essentially governed by the provisions of MCM, 1969 (Rev.), chapter VII, and the exercise of discretion by each Marine who performs any function connected therewith must remain completely unfettered. Accordingly, should disciplinary action for desertion or unauthorized absence be contemplated by the command, it is necessary that the running of the statute of limitations be tolled by the drafting and preferring of appropriate charges and the subsequent delivery to

and receipt of sworn charges by the officer exercising summary court-martial jurisdiction over the Marine's command. If such action is considered appropriate, the subject Marine should be first declared a deserter, then sworn charges receipted for by the officer exercising summary court-martial jurisdiction over the Marine command and then dropped from the rolls in that order.

2. Ref:
   (a) Navy Reg (NOTAL)
   (b) MCM 1969 (Revised Edition) (NOTAL)
   (c) JAG Manual (NOTAL)
   (d) MARCORMAN (NOTAL)

Likewise, the introductory paragraph of MCO P1070.12c dtd 8 Jul 1975 identifies the purpose of the IRAM as "the promulgation of policies, procedures, and technical instructions for the administration of personal records." Para 0001.1 IRAM. Based upon these observations, we find the *Rice* case and the case at bar readily distinguishable from *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) and its progeny.[3] Unlike those cases, there is neither language which expressly creates procedural rights in an accused nor language from which such a right may be directly inferred. Rather, the precatory language in paragraph 4001.1 when read in its proper context is indicative of a mere advisory statement. The guidelines set forth in paragraph 4014 2(a)(3)(b) constitute internal rules which were promulgated for the government's convenience in order to establish a uniform procedure for making service record entries. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. McGraner, supra.*

## VI

### Conclusion

Notwithstanding the opinion in *Rice,* we refuse to take the quantum leap required to find an intent within these regulations to benefit an accused. We specifically refuse to do so when such action would require us to engraft amendments onto the Uniform Code of Military Justice and the *Manual for Courts-Martial,* based upon gratuitous opinions as to the requirements of military law, especially when such opinions are beyond the scope of the manual's stated purpose.

As regards the provisions of the LEGAD-MINMAN, cited in *Rice,* we reach the same conclusion. When the specific provisions are analyzed in their total context it is clear that these instructions are purely internal administrative guidelines. No legal opinions are expressed as regards the dropping

of a Marine from his unit's rolls, other than by reference to the IRAM.

That being the case, the appropriate point of reference in determining whether the statute of limitations has been properly tolled is Article 43(c), UCMJ, not the IRAM.

As there has been compliance with Article 43(c) in the case *sub judice,* the conviction of the appellant may stand, notwithstanding the *Rice* decision, which we overrule. The findings and sentence as approved on review below are affirmed.

Chief Judge EOFF and Judges SANDERS, KERCHEVAL, GORMLEY, GLADIS, MITCHELL, BYRNE, LECORNU, GARVIN, AND BARR concur.

Judges RAPP and MIELCZARSKI concur in the result.

MAY, Judge (dissenting):

I dissent. The majority opinion in this case is an embarkation by this court into judicial rule-making.

### Congressional Intent

Statutes of limitations in the view of most jurists, exist as policy limitations on the chronological reach of prosecutorial authority. They are not "loopholes" or "technicalities" through which the guilty are able to spring free of disciplinary sanctions. The determination by the legislators of criminal statutes, on the contrary, to so limit prosecution for specified categories of crime, is directed at properly burdening the government to bring to bear, within reasonable time frames, the assertion of criminal charges against a person suspected of criminal activity. I am sure that none on this court dispute the necessity for such reasonable limitations as are contained in the proscriptions of Article 43(c), UCMJ. Certainly Congress in its consideration of the intent of our Code's statute of limitations, explicitly was concerned that the official who would act to toll the statute, and thereby preserve the currency of criminal

---

3. *See, e.g., Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).

charges alleged against one charged under the Code, would be that officer closest in *knowledgeable* command proximity to the accused. That is, that officer most likely to be in possession of information related to current status of the accused, existing service policies related to disposition of the specific charges, and with sufficient manpower management authority to expeditiously merge the physical location of an accused, his available service and related personnel records, and the pending charges without inordinate delay or undue expense. Congress's concern was obvious in desertion cases, which usually involved lengthy periods of absence with the potential for the physical movement of the command from which the absence occurred; the rotation or transfer of those personnel familiar with the charge; the location of personnel and service records, and the likely possibility that the individual would return to military control far removed geographically from the unit from which the alleged desertion was initiated. *See generally* comments of Mr. L'Heureux, Mr. Larkin, and Mr. Smart, INDEX AND LEGISLATIVE HISTORY, UCMJ, pages 821, 1035–36, 1039–43, 1264–65. A basic concept of statutory interpretation is that when the intention of the legislature is manifest, that intention will govern the application of the statute. *See* Clark and Marshall, A TREATISE ON THE LAW OF CRIMES 44–53 (1967).

*Discussion*

The salient issue in the *Rice* decision was not the status or the intent of Marine Corps administrative procedures in relation to safeguarding the rights of the accused. The determinative question was evident:

"Was the "command" which receipted for sworn charges subsequent to the appellant's "drop" from that command's rolls, also the "command" mandated by the Code and the Manual to properly toll the statute of limitation?" Article 43(c), UCMJ; para. 68c, MCM.

1. See Department of the Army Pamphlet 27-2, Analysis of Contents, Manual for Courts-Martial, United States 1969, Revised Edition, P.12–3. The "rewriting" of paragraph 68c in the

The majority here apparently recognizes, and understandably so, accepts the narrow, yet proper restriction of the officer who must toll the statute, i.e., that officer exercising summary court-martial jurisdiction from the command which *includes* the accused. MCM, (1951).[1]

However, after characterizing *Rice* as containing "quantum leap" reasoning and "gratuitous opinions as to the requirements of the law," the majority opinion embarks on a decisional process more reflective of a desired result than that of a reasoned judicial opinion resting upon sound concepts of law and factual findings reasonably flowing from factual *evidence*.

My brothers in the majority here signal their foray into the rarefied atmosphere of judgment shaped by result when the critical element of their analysis is introduced: "we interpret that the term command is that organizational entity which maintains a substantial, identifiable nexus, either operational or administrative, between the officer receiving the charges and the accused."

The majority opinion juxtaposes personnel practices from bygone eras against the realities of current military command and control structures by emphasizing the terms "electronic manpower management," "program a replacement," "efficient centralized control" "electronic means," as if such terms represent solely accounting actions at odds with the "true relationship between appellant and his unit."

To legitimize this supposed "true relationship" between the appellant here and the squadron from which he had been dropped from the rolls, the majority opinion then presents the following points of supposed "nexus" between appellant and his former unit:

1. Appellant is asserted to have retained sufficient linkage to that unit because he was "not processed via "transfer" or "change station" entries and information

1969 Manual apparently did not have, as a stated intended purpose, a broadening of identity of the officer receipting for charges.

as is true of other transferees." The basis of this assertion of supposed fact is cited as "Paragraph 4007, LEGADMIN-MAN and Chapter 5, Marine Corps Order P. 1080.35c, Marine Corps Personnel Reporting Instructions Manual (PRIM)." An examination of both of these cited directives, however, reveals no such limited and narrow view of transfer procedures. The cited directives are clearly inclusive statements of procedure and reflect the possibility that personnel transfers may be effected without specified transfer/change station "entries." [2]

2. There was no "physical movement" of the person of the appellant to another command or, upon recovery, from another command, as is the customary meaning of the term "transfer." (SIC) The authority for this statement is cited as "Naval Terms Dictionary." Left unstated is the relevancy of "physical movement" of an unauthorized absentee in relation to the determination of the identity of the absentee's "command."

3. "All of the indicia of command responsibility for the appellant such as custody of service records, pay record, health record, personal effects and re-entry to the rolls of the unit upon return to the unit remained with WTS–37." The authority for this assertion of supposed fact is cited as "Paragraph 4002, LEGADMIN-MAN." The cited authority, however does not contain the slightest indication of the *actual* holding and maintenance unit designated to maintain a dropped deserter's service record book. The maintenance and custody of disbursing records, health and dental records, which

are documents generally maintained entirely outside any individual command by area disbursing and medical facilities is not even addressed in the cited reference. In regards to personal effects, Chapter 4, Marine Corps Order P.4050.38A, Personal Effects and Baggage Manual, directs the appropriate inventory and physical disposition of all personal effects with directed transfer of custody to designated recipient agents of the absentee or to the custody and control of Marine Corps Personal Effects and Baggage Centers.[3]

4. "When a deserter is recovered, he is returned to the unit from which he absented himself." The authority for this unconditional statement, almost unbelievable on its' face, is cited as "Paragraph 4007. LEGADMINMAN." The cited authority however, is replete with specific directives for exactly the opposite proposition.

5. "When the deserter returns to the unit, no authorization from Headquarters Marine Corps to rejoin the deserter to the rolls of the parent unit is required." The authority for this unconditional statement is "Paragraph 4007.6. LEGADMINMAN." In the very paragraph cited, authorization is granted to *any* Marine "joining command" which may receive *custody* of a returned deserter or absentee to "join" that person without regard to the identity of the deserter's "former command" and without apparent authority from Headquarters Marine Corps.

It is primarily, on the basis of the above cited "facts", that the majority asserts: that *Rice* was incorrectly decided, and that

---

**2.** If no "transfer" has occurred in the case of deserters dropped from the rolls, why then does Marine Corps Order P1080.20F, Manpower Management Codes Manual (CODESMAN) contain a specific listing of "Strength Category Codes" which are "intended to describe the type or nature of an individual's service *within* a unit." and that list contains no category code for deserters? (Emphasis added) While there are strength category codes for both "chargeable" and "non-chargeable" personnel, including categories for personnel on appellate leave; in hands of civil authorities; serving confinement sentences of courts-martial; missing and captured personnel and personnel hospitalized;

there is *no* strength category code for personnel dropped from the unit's rolls due to desertion. Paragraph 1240, CODESMAN.

**3.** Is it presumed by the majority here that a Marine Corps unit would in fact keep actual custody and control over service record, health and dental records, disbursing records, and personal effects of all personnel dropped from unit rolls to desertion status for a period of 18 months? The storage and maintenance drain on unit resources would appear, on their face, to be enormous.

there was compliance with Article 43(c) UCMJ, in this case when an officer exercising summary court-martial jurisdiction within a unit, WTS–37, receipted for the charges alleged in this case, subsequent to the date appellant was declared a deserter and dropped from the rolls of the unit. The majority, therefore, would affirm the conviction of appellant.

The above "facts" so easily found by my brothers in the majority opinion rest upon almost no factual *evidence.* There was no evidence presented on this issue at the trial level; this court has not ordered the production of any factual evidence prior to, during, or subsequent to its en banc oral hearing on this case, and the court has directed no judicial hearing in an appropriate forum to take evidence on the issue. On the contrary, the majority here have joined in an opinion that, taken in even the most favorable light, lacks any apparent concern for the necessity, basic in any credible appellate decision, that factual pronouncements must rest upon an observable foundation of factual evidence.

This court has made no attempt, whatever its desire to overturn the decision in *Rice,* to order an appropriate hearing by a judicial officer, empowered to receive evidence, including sworn witness testimony and competent documentary submissions, within an adversarial setting, on this critical issue. *See United States v. Dubay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

It must be presumed, from the face of the opinion, that the majority here, has tortiously molded a significant decision, overturning a prior decision by a panel of this court with no apparent factual evidence beyond references to existing directives and the minimal, unsworn assertions of appellate counsel during en banc hearing. This approach, exhibiting explicit indications of judicial law-making, does not foster confidence in the court's accomplishment of its statutory responsibilities.

In contrast to the supposed "facts" asserted by the majority, the following extracts from the unrebutted *sworn testimony* contained in the *trial record* of the *Rice* case is presented:

*Government witness:*

Chief Warrant Officer R.R. Hairston, USMC, Regimental Adjutant, 8th Marine Regiment, Second Marine Division, FMF. Questions by trial counsel:

. . . . .

Q. Warrant Officer HAIRSTON, what unit and organization are you in?
A. I'm in Headquarters Company, 8th Marines.
Q. Okay, and is that in 2d Marine Division?
A. 2d Marine Division.
Q. And how long have you been in the Marine Corps?
A. I've been in the Marine Corps 12 years.
Q. Continuous active duty?
A. Continuous active duty.
Q. What are your present duties?
A. I'm the 8th Marine Regimental Adjutant and Legal Officer.
Q. And how long have you been in the administrative field?
A. Since '75, six years.
Q. Do you work specifically with unit diaries and page 12's?
A. Yes, I do.
Q. And have you been directly involved in the administrative processing of dropping a Marine to desertion?
A. Yes, I have.
Q. Would you explain to this court please what it means to declare a Marine a deserter?
A. To declare a Marine a deserter is an administrative procedure in dropping non-chargeable Marines from our rolls as non-effectives.
Q. Would you explain the distinction between declaring a Marine a deserter and dropping him from the rolls as a deserter?
A. The administrative procedures delineate dropping a Marine by . . . by using the MMS system automatically drops him from our rolls as a non-charge . . . as a chargeable Marine and

he goes ... becomes a non-chargeable Marine.

Q. And what does it mean to become non-chargeable?

A. It means that he is not considered as a physical Marine located within the unit if the ... if our unit was called out to deploy or to ... or to move.

Q. When a Marine is dropped from the unit, is he joined to another unit?

A. Yes, he is placed in an administrative limbo status from his master records which are held at Headquarters Marine Corps and his field master records which are held at Headquarters Marine Corps and his field master records which are held in our local ACU district.

. . . . .

Questions by Military Judge:

Q. Warrant Officer HAIRSTON, there's a distinction, isn't there between an entry declaring a Marine a deserter and an entry dropping to desertion, dropping from the rolls?

A. Yes, sir, yes, sir, there is.

Q. I think the entry is implying if we know to begin with that there's a permanency involved in him going to desertion-missing movement, or in times of crisis he willfully went UA to avoid going in .. into whatever action that his unit was committed, then the desertion, Article 87, is implied. Which entry would you make under those circumstances?

A. Drop ... dropped from the rolls of the unit, sir.

Q. Now, dropped from the rolls as a deserter, is that the instance you've been testifying about all along?

A. Yes, sir, yes, sir, it is.

Q. What is the distinction then between a declared deserter entry?

A. Well, sir, I ... I feel that the declared deserter would be a commanding officer's perogative and determination and I would have to get guidance from him before I would ... from ... as an administrator to put that in the official administrative records that would be forwarded to higher headquarters and to the appropriate sections.

Q. Which entry in your experience has ... indicates more permanency?

A. The drop to desertion, sir.

Q. Dropped from the rolls to desertion or dropped ...

A. or being ...

Q. Dropped from the rolls as a deserter?

A. Dropped from the rolls as a deserter has more permanency, sir.

. . . . .

Q. Under what circumstances do you take the action contemplated in paragraph g(b)? (Question referred to Paragraph 4002.2g(b) LEGADMINMAN).

A. The action that is delineated here, sir, is action taken by *Division deserter section* (emphasis added) after the 19th month of him being absent and not returning. Then the book is closed out and forwarded to Headquarters Marine Corps. Upon us determining that he was not in a deserter status, sir, we would have to go in by AA form and request a correction to that.

Q. Now, have you ever been actively involved in the closing of those books and forwarding them to ...

A. Commandant of the Marine Corps, sir?

Q. To Commandant Code, what is it, MPH ...

A. MPH–57. No, sir, we don't. Division does that.

*Witness called by Military Judge:*

Captain C.E. Knight, USMC, Legal Administration Officer, Office of the Staff Judge Advocate, Second Marine Division, FMF.

Questions by the Military judge:

. . . . .

Q. Okay, thank you. The question that the court has to ask you in a situation where a Marine is run by his unit, "Drop, declare deserter", what

command is that Marine attached to at that point after the entry is run?

A. After he's been dropped from the unit?

Q. Yes, dropped from the rolls and declared a deserter.

A. It's my understanding that he then becomes a member of Headquarters Marine Corps until further assigned by that unit.

Q. Do you know what action is necessary to reassign such a Marine once he returns to military control?

A. Yes, sir. You submit a Naval message to the Commandant of the Marine Corps requesting authorization to join him on your rolls facing disciplinary action.

Q. Assuming that permission is then granted, the man is joined?

A. Yes, sir.

Q. The man's prior unit, the unit that dropped him from the rolls as a deserter, does that unit retain any operational or administrative control over that individual?

A. No, sir, not to my knowledge.

Questions by the trial counsel:

Q. Captain KNIGHT, you stated earlier that for a unit to join back a Marine from desertion requires a Naval message to CMC. Are you absolutely sure of this procedure?

A. That's the way it has been done in the past. It's been some time since I've worked with it. They would have to have authority from Headquarters Marine Corps to rejoin the individual. Once he's been dropped, it's my under-

standing that he then becomes a member of this Code MPH–57 at Headquarters Marine Corps for administrative purposes.

The comparison between the bases for the *Rice* decision and the case *sub judice* is, in my view, glaring. I trust my brothers are not contending that the significant assertions in the majority opinion do not require any evidentiary support because of some aberrant concept of "judicial notice." If such is the case, the majority opinion is woefully lacking in the specification of items thus considered and the identification of the authors of such supposed "institutional knowledge."

Although my sharpest disagreement here is directed at the failures of my brothers in the majority to express the slightest disquiet with the insufficiency of support for their position, I am also concerned that after two appellate hearings on this specific issue, that so little credible evidence or authority has been provided this court by either the government or the appellant on their own initiative.

As my brothers have chosen to resolve this issue as indicated in the majority opinion, I dissent. I would reverse the decision in this case. *United States v. Rice,* 15 M.J. 605 (N.M.C.M.R.1982).[4]

CASSEL, Judge (dissenting):

The critical factual issue, unresolved in this case at the beginning of the appellate process, and, I believe, still unresolved now, is whether or not the officer who receipted for the charge was in fact *an* officer exer-

---

4. A recommended point of inquiry on this issue, in an appropriate forum, is:
Officer in Charge,
Deserter Section
Reporting Unit Code of this section: 54980
Monitored Command Code of this section: W96
Headquarters, U.S. Marine Corps (Code MPH–57)
Washington, D.C. 20380
"Reporting Unit Code (RUC)." "A code assigned to identify a unit, activity or subunit. RUC's are also assigned to identify echelons of command which may not submit unit diaries, e.g.; division, brigade, regiment, battalion, aircraft way and aircraft group." Para. 1009, (PRIM).
"Monitored Command Code (MCC)": "A code assigned for identification and control purposes to each command, unit activity, or an individual billet to which assignment of individuals is controlled by the Commandant of the Marine Corps." Para. 1009, (PRIM).
*See also:* Department of Defense Directive 1325.2, dtd 20 August 1979.

cising summary court-martial jurisdiction over the command. In this regard it is clear that the provisions of paragraphs 33 and 34, *Manual for Courts-Martial, 1969 (Rev.),* should be considered in determining the definition of the phrase "by an officer exercising summary court-martial jurisdiction over the command or before the imposition of punishment under section 815 of this title," the operative language of Article 43(c), UCMJ. That was not done in this case.

In their effort to make what they believe are the Navy and Marine practices coincide, without receiving the benefit of having any facts presented on this issue, my brothers have taken the determination of what was clearly intended to be a ministerial function, *i.e.,* the tolling of the statute of limitations, and, contrary to the clear legislative history, even as interpreted in *United States v. Centeno,* 17 M.J. 642 (N.M.C.M.R. 1983), placed a nexus requirement upon the propriety of that ministerial action rather than letting it be accomplished solely in accordance with normal military regulations and command structure as had been done previously.

The decision to have a statute of limitations is a policy one. Once that decision is made the policy behind any such statute is served best by a strict, mechanical, even-handed interpretation of the facts involved. Predictability of result is of paramount importance. The majority here has eroded the predictability of our statute without the benefit of any factual presentation. So to an extent, I must agree with my brother, Judge May, that they are engaged in judicial rule making by substituting their regulation for the Commandant's.